v. FEDERAL ENERGY REGULATORY COMMISSION. MISS GARRIS FOR THE PETITIONER ENVIRONMENTAL DEFENSE FUND. MR. ROBERTSON FOR THE PETITIONER JULIE SEC. MR. VISWANATHAN FOR THE RESPONDENT FERC. MR. FRANKLIN FOR THE INTERVENER. Good morning, Miss Garris. You can proceed. You can proceed. Thank you, Judge Tito. Good morning, and may it please the court. Natalie Garris for Petitioner Environmental Defense Fund. I'd like to request two minutes for rebuttal. Under the Natural Gas Act, FERC can only approve a proposed pipeline if it is required by the public's convenience and necessity. This demanding standard must be satisfied before private companies such as Spire can use eminent domain power to take homeowners' property and permanently alter the natural landscape. In the orders below, FERC relied exclusively on a single affiliate precedent contract agreed to behind closed doors and paid for by captive customers in a region with excess pipeline capacity and no new load growth. FERC's orders are deficient for many reasons, but I highlight the two most egregious errors today. First, FERC relied exclusively on an affiliate precedent agreement signed by utility with captive customers to demonstrate market need despite significant warning signs that the affiliate arrangement compromised the probative value of that agreement. Second, FERC violated its own certificate policy statement by performing a deficient balancing analysis, which ignored the affiliate project's adverse effects on landowners, the environment, and existing pipelines and their customers, and relied on vague and illusory benefits. As to the first point, in her dissenting opinion, Commissioner LaFleur stated that the Spire affiliate project is the unusual case of a pipeline application that squarely fails the threshold economic test. FERC relied solely on the utility affiliate agreement to find need, ignoring record evidence that significantly undermined the probative value of that agreement. What do you think the most significant evidence is that undermines that? The most significant evidence is a series of factors that illuminate the skewed incentives underpinning the agreement and the market conditions in the area. So Spire is a single dominant buyer within the region and can simply pass the costs on to captive customers. But under City of Oberlin, they can rely on a precedent agreement, even with an affiliate, acts as evidence of self-dealing, right? So that's why I ask you, do you agree with that about City of Oberlin, if that's what that says? Yes, I agree in that case that the court referenced the self-dealing. The facts in that case are completely different. In City of Oberlin, there was increased demand, and the project, the Nexus pipeline, was supported by a diversity of subscribers. The question before us is whether FERC's decision was arbitrary and capricious in the sense in which it examined the evidence of potential self-dealing, correct? Yes, FERC had to look at the self-dealing issue. That is correct. So that's why I ask you, what's the strongest evidence from your perspective that FERC should have looked at and didn't? The strongest evidence is the comparison of the cost of the transportation capacity that Spire paid Spire, which is $0.25 per decatherm, and that is at Spire's brief, page 21, note 4. That exceeded the rate for transportation capacity on the neighboring pipeline where Spire turned back the capacity. And the cost of that capacity ranged from $0.10 to $0.22 per decatherm, and that was in the joint appendix at page 842. I'm confused. I thought FERC said there was no material difference in the two rates. Is that wrong? So FERC, in the paragraph talking about the delivered cost of gas, the delivered cost of gas incorporates both the commodity, the molecules of gas, coupled with the transportation capacity. If you look at the cost of the transportation capacity alone, it was higher. And even if you looked at the delivered cost of capacity, FERC found there was no material difference between the Spire pipeline and the neighboring pipeline. And coupled with that, there were significant market conditions. The region has a track record of failed projects. There is already available excess capacity in the region. No other entities bid on the capacity. The project provides no meaningful cost savings for customers. Spire turned back the cheaper transportation capacity on the neighboring pipeline. The state regulator warned that the region could not support an additional 400,000 decatherm per day project. The precedent agreement was the result of internal discussions among Spire, not in open season. There was no transparent or competitive process to compare the affiliate project with non-affiliated alternatives. Numerous parties protested the project, including the neighboring pipeline and the state commission. And the neighboring pipeline considered joining the project as a co-developer, but ended the discussions when it concluded that the project was uneconomic on a standalone basis. So you say that FERC relied solely on the precedent agreement, and I'm not sure I'm completely understanding that. Didn't they cite other reasons to justify their decision? Enhance reliability and supply security, reduce reliance on older natural gas pipelines, etc.? There were several reasons given, not just the precedent agreement, right? So under the FERC certificate policy statement, the threshold economic question is whether there is market need for the pipeline. And to make that finding of market need, FERC relied exclusively on the precedent agreement. Parties asked FERC to consider additional evidence on the issue of need, and FERC said, no, we disagree, we need not do that. That was at paragraph 75, Joint Appendix 963. I know, but what I'm trying to figure out is, what weight do I give to these other factors that FERC is reciting to justify its approval? The test is confusing as being applied. You're arguing past each other or maybe past me. On the one hand, there is heavy reliance on the precedent agreement, but on the other hand, FERC does recite other factors. So on the one hand, they're just claiming a need to go behind it. I don't know what that means because they recite other factors that they think supports their approval. So the first threshold question is, is there a market need? If you can answer that question in the affirmative, then you consider whether the project's public benefits outweigh adverse effects. And FERC considered those other factors. Now, do you think the absence of market need or a flattened market kills the project that precludes FERC giving approval? That's not my understanding. So there could be an example of a project that is needed for reliability. There's no record evidence here to suggest that reliability would be compromised if the project was not built. Just like if you built- But they're saying reliability will enhance with the project being built. Right. So just as if you built 10 additional pipelines to St. Louis, all of those pipelines would enhance reliability. So FERC must first look to see whether there's a market need. FERC found if the project is not built, the fire misery will rely on existing systems in the area- No, I understand that. But what I'm trying to understand is the absence of need killing. I mean, does that end the inquiry? Yes. If they show flat demand and no likelihood of increased demand, then FERC should lose in all such cases? No. There could be a situation where there is no new low growth and a project is proposed for the specific reason to enhance reliability. That's not what the project was proposed here for. It was proposed- I thought your point was that- I thought your whole point here was not that the absence of market need would kill the project, but that it simply requires FERC to look more deeply into whether or not there is self-healing. Right? Isn't that right? So, yes, that first- Did I miss the point of your whole brief? No. You're asking for a remand to FERC to examine the evidence of potential self-healing. Correct? You're going to have to answer that because I'm now confused as to what point you're relying on. Because it sounds like- I'm not interrupting, David. I want to make sure she answers. That's okay. Go ahead, Eric. It sounds like your principal argument is they relied solely on a precedent agreement in a flat market and with a deal with an affiliate. And that should end it, I heard you saying. Now, Judge Tatel is asking a slightly different question, whether FERC failed to address self-dealing. And which is it that you're relying on or how are you weighing them? So, I would say the threshold question is whether there is a market need for the pipeline. And what FERC did in this case, it looked exclusively at the existence of a precedent agreement. It didn't look beyond the fact and- Well, that's why I keep asking you, do you think that that ends the inquiry? Because there is no need here, at least as I understand the record. They can't show a need. It's a flat market. Unless you define need as increased reliability and such factors, there isn't an increased demand here. And I'm trying to understand from you, are you saying that's the end of it? If they cannot show an increase in demand to show that kind of a need, that should be the end of the inquiry. Is that what you're saying? Yes, it should be the end of the inquiry. Now, what case says that? So, I would say that- The only time you can build a pipeline is if you can show there's going to be increased demand and you've got to meet that increased demand. That's what I hear your argument to be. Let me just take a step back. So, I'm not suggesting that there could never be a project where there is flat demand and a project is not demonstrated to meet a need, for example, of reliability or flexibility. That is an example that could occur, could go down that path. That is not what FERC did here. It relied exclusively on the existence of the precedent agreement. By saying that, do you mean if there were actual reliability concerns, like the existing pipeline kept breaking, kept shutting down, or was a very unreliable source and there was a real problem? Then that could certainly demonstrate need, even if there weren't. Just to keep getting in what you're already getting has proven to be a problem, even if there isn't an increased demand for gas. But in this case, the reliability and flexibility was kind of icing on the cake. It was just more reliable and more flexibility, which any new pipeline can add. Is that your point? Yes, thank you. That is my point. Thank you. Go ahead, Dave. No, you go ahead, Patty. I'm going to change the subject slide. I think we're all having trouble analyzing this, the role of economic need here. I thought it was a sort of both point. And that is, first, in the absence, FERC having said the only basis for economic need is the agreement, then it rises or falls on that at that first step. And then at the second step, even if we go past that first step, when we get to the balancing, the lack of need also weighs in quite heavily in the balancing test and requires a much higher showing of public benefit to make up for the absence of need. Am I wrong about that? That's correct. The two problems are related in the fact that if there are significant adverse effects, as there were here, that requires a heightened demonstration of need. But as to the questions that you were being asked about the role of economic need, just as an independent test by itself, I thought that ordinarily we only look at economic need as a freestanding inquiry when you're talking about an existing pipeline, which we aren't doing here. And so really, under FERC's certificate policy statement, this should all be a question under the balancing test. So you are correct that if this was an existing pipeline, FERC would look to see whether other customers would be subsidizing the project. But because FIRE is a new entrant pipeline, that question was not implicated here. So FERC has to, under that first question, look at whether there is a market need. And here it looked exclusively at the precedent agreement. And what role would affiliate abuse play? Would that just negate a showing of need or does that come into the balancing test? If we find affiliate abuse and this is the only agreement they're relying on, does that end the inquiry? So it's not just no market need, it's flat need, but there also was affiliate abuse with that. And the inquiry would let that go into the balancing test. So I would look at Commissioner LaFleur's dissenting opinion where she left affiliate abuse out of the analysis altogether. I'm asking you if there are concerns about at least the sufficiency of analysis of whether there's affiliate abuse. And I'm trying to figure out where that fits into these different stages of the test we've been talking about. The affiliate abuse undermines the probative value of the agreement. And so to exclusively rely on the existence of an agreement without analyzing the significant warning signs that compromise the probative value occurs in that first step of the analysis. I'm sorry, Judge Tatel, if I could just ask one more question. Are you aware of any FERC cases? Sorry? No, go ahead. Are you aware of any cases from this court or FERC defining what affiliate abuse means? And if not, do you have a definition? So I would look to the Cove Point decision, 68 FERC 61128. And in that case, it involved a regulated affiliate purchasing storage services from the pipeline applicant. So just as Fire Missouri is a gas utility, you had regulated gas utilities seeking to purchase storage services at market-based rates. And FERC expressed concern in that case that a regulated affiliate purchaser could purchase servicers above those established in a competitive market. And so it denied the rate proposal in that request and found that, you know, there was a significant concern regarding the threat of affiliate abuse. There's a whole host of other cases falling under different statutes that FERC administers where it finds the threat of affiliate abuse and takes action and steps in to address it. So it doesn't actually have to find affiliate abuse. It's really if it's sort of an eyebrow-raising test. If it seems concerning, then that takes material error out of a claim of need, as in this case. Right. It was the threat of affiliate abuse in the Cove Point case that FERC sought to address. So they didn't actually go forward and say, you have to actually find it and prove it. It was kind of a smell test. Right. It was the economic incentives and the fact that the utilities, excuse me, the affiliates could work in concert together to increase prices to captive customers. Let me try again to make sure I understand. I apologize if I'm not getting your point. Again, because I hear you starting out by saying they relied solely on the precedent agreement, period. I can understand the argument in the abstract, but I'm not sure that's what the record is suggesting. They thought a justification for the pipeline was to enhance reliability and supply security, reduce reliance on older natural gas pipelines, reduce reliance upon mature natural gas basins, and eliminate reliance on propane peaks shaving infrastructure. Did FERC credit those things? So in the initial order, FERC declined to credit those. It found that those issues fall within the scope of a business decision of a shipper and it would not look at it. In the rehearing order in paragraph 24, which Commissioner Glick described as a throwaway paragraph, FERC described those issues as benefits. That's my point. That you characterize them a certain way, to me, is beside the point. In the rehearing order, when pushed, they're resting on it. Now, are you saying their reliance on those interests are bogus? And if so, how so? And if it's not bogus, why isn't their reliance on those interests sufficient to overcome your claim that all they did was rely on the precedent agreement? That's what I'm trying to understand here. Because they did cite these things. Now, hear what I'm hearing from you. You're saying, yeah, Judge, they did in the rehearing, but that's nonsense. And I'm saying, really, why is it nonsense if the words are written? So there was significant record evidence undercutting each of those justifications. So it's arbitrary and capricious because what they claim to be relying on is not supported by the record. That's your argument? See, I didn't get that. I would understand that's typical arbitrary and capricious review. You're saying they claimed in the end analysis to be relying on these four things that the other side is relying on. But, really, the record does not support that. I didn't read you to me making that argument. Is that what your argument is? So I'm saying we can end the inquiry after the first prong. The threshold economic test, we can end the inquiry. It falls on that prong. Well, and I asked you where is there a case that says if you don't have demand, that's the end of the inquiry. And you said you don't have one. You don't have any such case. That's why I don't understand you're saying you're looking at the precedent agreement and you're saying but there's no demand and this is with an affiliate and so that should end it. And I'm saying that's fine if you're right. Where is there precedent for that proposition? There has never been a case before FERC with this exact set of facts. There has never been a single utility affiliate. Okay. So do it this way for me. I know there isn't any such case. So now you be the writing judge. You're now asking us to make up something that has never been done before and what would our justification be? What would we say? You're saying if the precedent agreement is all they have in a flat market, that's enough to overturn it. There's no precedent to support that. How would I write that? So I would look to this court's decisions in three cases. The Tejas decision and the Missouri Public Service Commission and the Lickley decision. And those three cases all stand, you know, defined for section 7 obligation. They all say the court has found that FERC cannot fulfill its section 7 obligation by merely relying on the existence of agreements entered into by retail gas utilities because the utility can simply pass those costs on to captive customers. FERC retains the responsibility of making an independent judgment and has the duty to use its section 7 power to protect the public interest. Let me immediately tell you what I'm thinking as you're saying this. I'm thinking they have, in the rehearing, relied on the interest cited by the other side. And you simply respond to me saying, well, that's a blow off. Why? As a judge, how can I just say, well, that's nonsense, unless you show me that what they've relied on that has been cited by the other side is not supported by the record. And I didn't hear you to make that argument in the brief. So may I address that? Yes, please. And I'm sorry to pressure you, but I'm really trying to understand the theory. So there are significant record evidence undercutting all of those justifications. Did you argue that in the brief, that it's arbitrary and capricious because the record doesn't support those claims? I missed it if you did. Yes. In our reply brief, we talked, there are three overlapping obligations here. There's the obligations under the Natural Gas Act. There's the obligations under the Certificate Policy Statement. And then there's the obligations under the Administrative Procedures Act. And FERC orders here violate all three of those overlapping legal obligations. Okay. I thought, Ms. Carson, I'm completely confused. I'm done, David. Well, I just want to follow up on your question. Yeah, yeah, no, that's fine. I think you focused in on this. I had understood your position to be that at the first stage of this, that is the market analysis, that the failure here was that FERC did not adequately consider evidence of self-dealing. Right? And that we don't even get to the balance. Isn't that your theory? And with respect to the four items that, well, let me ask you that. Am I right about that? Yes. The point that we're making here is that the precedent agreement was not enough and that the threat of affiliate abuse undermined the probative value of that agreement. So the issues are intertwined. Under our case law, a precedent agreement with an affiliate is perfectly okay, absent evidence of self-dealing. Correct? There has never been a case with this set of facts where the project is supported exclusively by a utility's captive customers. That has never been presented before this court. And so, as Commissioner Glick said in his dissenting. In the city of Oberlin, we said a precedent agreement with an affiliate is okay by itself, unless there's evidence of self-dealing. Right? That's why I asked you the very first question I did. I thought the question in this case was whether or not FERC had acted arbitrarily, capriciously in not considering the evidence of self-dealing that you think exists in the record. And with respect to the four factors that Judge Edwards mentioned, I thought your position was, yeah, the commission cited them, but didn't actually review them, didn't actually consider them. Am I wrong about that? Right. It was one paragraph. It was what Commissioner Glick described as a throwaway paragraph. He describes it that way, that, you know, we do a lot of stuff in one paragraph. Right. That's my health. We pack a lot into a paragraph. Sometimes even a sentence. So I can walk, if I may, I can walk. Go back to Judge Edwards' question. What do we do about paragraph 24? Yes. So there is significant record evidence that undermined all of those justifications. So first, there was multiple pipelines that already provide Spire, Missouri, access to supplies flowing from the Rex pipeline. And Spire, Missouri, already has a transportation path that avoids a seismic zone. Is this all in your opening brief where you're attacking that paragraph? We, in our opening brief, we attacked the ‑‑ No, no, really, stay with me, and I don't mean to be a pain, but I really need to understand. I hear what Judge Tatel just asked you, what I've been trying to ask you. Did you, in your opening brief, focus on those factors and say, there's no record evidence to support those findings? Because I don't remember it. So we presented record evidence to undermine the claim that, you know, regarding the need for the propane facilities that was included in the opening brief. And, you know, there is significant additional record evidence to undercut all of those other justifications, if I could walk through that now. Before you do that, can I just say, like, your second D2 of your opening brief on page 39 is the record does not support FERC's finding of benefits? That's what I'm trying to find out. You did argue it in your opening brief. That seems to me the short answer to Judge Edwards. You did argue that in your opening brief, that the benefits were not supported by the record. And you went through that paragraph and those four factors. So we made that precise point that Judge Millett ‑‑ No, no, I hear what Judge Millett, and I read the heading. I'm asking you, did you go through that paragraph and cite those four factors? I mean, it's a really straightforward APA-type argument that we get all the time. Either did or you didn't. An agency relies on four things. It clearly relies ‑‑ they're relying on four things. They're doing it in the rehearing. But they rely on it. And all I wanted to know is, do you think in your opening brief you took that apart and said, one, two, three, four, they're wrong. There's no record evidence to support it. Either did or you didn't. Yes, I think we did make that argument in section D2 of our brief. We explained that the balancing analysis was completely deficient here. Okay. Because it's a perfunctory assertion of benefits. And it was just conclusory with no backing it up. By far, it didn't back it up. It just made those statements. It didn't make any findings. I take that. You mean by perfunctory. And I think you cite the defense saying a conclusory sentence stating that there's these benefits. Right? Yeah. That's arguing there was no ‑‑ I mean, you could be right or wrong about this. But it seems to be an argument that there was no they're there when FERC invoked those other concerns. Obviously, the other side may well disagree with that characterization. But that seemed to be your argument to me. Yeah. That is what we were speaking to do in the brief. Let's go on. It's okay with my two colleagues. Let's go on and hear from the other petitioner. We have a couple minutes on the floor. Okay. Thank you. Thank you. Mr. Robertson. Hey, please, the court. My name is Henry Robertson on behalf of Julie Steck. Late last week, the court ordered that the parties be prepared to address Ms. Steck's standing. We did address it in our opening brief. And in the declaration of standing, it was filed as an addendum to that brief. And I laid out the case for injury to aesthetic, recreational, and safety interests, which are ongoing. And also independently procedural standing for procedural injury that may be redressed on remand and reconsideration of environmental issues. On your first point, aesthetic injury, she says, your client says that she's injured because she drives by this ugly station three times a week. Right? Do you have a case that supports that for Article III injuries? There is case law on, you know, she said that it is not in keeping with the character of the neighborhood, which is residential and wooded. But she drives, I'm asking about, she drives past it. She doesn't live next to it. She drives past it.  She says the injury comes from driving past it three times a week. Is that the only route by which she can reach the north-south artery in that area? What's your best case for that? I don't think I can figure out, single out a case at this time. It's enjoyment of her property, the character of the neighborhood. It's also her recreational interests in the park. And the safety concern regarding the sharp S curve around the meter and regulator station. So did the construction of this facility create that sharp S curve? Yes, it did. It made it a blind curve at any rate. The road didn't curve before the construction of the station? If it did, it was not a blind curve. You cannot see around the thing that sits there now. Does she allege that in her complaint, in her affidavit? I believe so, yes. We certainly allege that it was a safety hazard. No. It was a blind curve. We did allege it was a blind curve. By the construction. By the construction of the meter and regulator station. What was there before the meter on that land? I believe it was woods. They cut a number of trees before they built it. You said there were a lot of trees there. That was sort of the character of the region. Did the trees obstruct the view around the S curve? I don't know. We don't know that. We don't know if the, I guess, if there's now a building where there were trees and you have a dangerous S curve. The question is whether. You could see any better on the S curve from. Trees rather than a building. I would have to ask her. The right answer. The answer. To be in her declaration. I know I'm about to go beyond the record a little bit, but my law clerk looked on Google view. Google, what do you call it? Google street view. And he says, you couldn't see around that corner. Even before the trees. Now that's not record evidence, but that's why the declaration has to have something in it about causation. I mean, the declaration has to state. That the construction of this actually caused it. This was not a traffic obstacle prior to the construction. That's what causation is all about. Well, I could consult her and ask the file. That doesn't help you. You rise and fall on your declaration. Here. That's it. Maybe it's enough. Maybe it's not enough. You know, we don't, we don't have. We don't have. We don't have cases where you say, okay, well, it's not enough at oral arguments. So you go talk to the client. This is the record on which we have, on which we have to decide. Okay. Article three. Well, there's precedent for supplementing. Okay. So you're agreeing then that it's not in the declaration. Right. No, I don't think. It says enough in the declaration about the previous character of that intersection. Thank you. We still have procedural standing. Can I ask. Yeah. I just have a fact of fact question. And that is. I'm a little confused. The chain of rock station. Existed before. The construction and. Is that, is that right? And that was just expanded to this corner in the construction. Is that what happened? No, I believe it was a brand new. Brand new. Okay. Okay. Okay. Some of the record evidence indicates that they were connecting to an existing station, but then there was some. Supplemental construction. But you think the whole. If there was anything there before it was a much smaller, there was a big. Embankment added on the East side, the Riverside. And the. Fencing all around. Too large. At least two large buildings. Okay. I'm done. And then you mentioned. A recreational interest. Can you. That relates to the park under which. The pipeline was run. Or she kayaks and hikes. Does she, does that. Prevent her from kayaking or hiking. The pipelines under underground there. Yes, it is. Okay. Okay. So she can still. Hike and kayak without seeing anything. Yes, you can. So what's the injury. Recreational interest. During construction. I can't say that it's ongoing. Oh, that was one. Okay. I get during the construction. Okay. Thank you. Okay. Okay. Did you have anything else? Cause you're, you're out of time. Yes. Well, I just want to say we have independently. Procedural injury. From the NEPA violation. And that can be remedied on remand to the FERC for reconsideration of the environmental issues. And that is not affected by the completion of the pipeline of the NEPA.  It's a non-meter regulator station. But it's an independent source of standing. Actually one thing about your NEPA claim. And that is. The point of this pipeline was. Move gas from the Marcella and Utica shales. Processes there are mining activities. And. Gas extraction. My understanding is those are, are fracking are done by fracking. Was the. What was the method by which gas was extracted from. When they previously, but when they were getting. Gas. Through the enabled pipeline. I don't think it's in the record. I've assumed that it was conventional gas production, but I really can't say for sure. Okay. All right. I wanted to make, I wanted to clarify whether your upstream effects argument. Involved a switch from natural. To fracking.  it sounds like there was a potential drilling to. Increase in greenhouse gases associated from the switch from natural gas drilling. But it sounds like that wasn't your idea. Well, that is my understanding. It is my argument that fracking. As a technology is, has more greenhouse gas effect because it releases. Methane fugitive. You'd have to know what, where they were getting their gas. I'm not sure. I'm not sure. Whether the gas before it came from fracking. To be able to argue that that was a cause of upstream effects. And it sounds like you. It's not clear on the record, whether that argument is relevant. I'm not absolutely sure. All right. Thank you. Thank you. Thank you. We'll hear from FERC. Good morning, your honors on this one often on behalf of the commission. So there's a number of issues to get to, but before I do, I want to clarify one. Record point from judge. Let's question about whether. The chain of rocks metering station existed before. I'm not sure. You can look at the. Beginning of the certificate order. This is J a nine 34. Paragraph six and seven. Paragraph six says. That there would be as a result of the project, a reconfiguration of an existing. Chain of rocks interconnection with spire, Missouri. And it describes how this is actually. It's essentially expanding an existing metering station. So it's not a brand new. Structure. So there was already a metering station there. Presumably with. Pipelines underground running to that metering station. Correct. Correct. And I think that this issue about the safety hazard in the. Blind curves. I will say that there's nothing in the affidavit that makes clear. When that traffic condition. Arose like whether it arose as a result of the project. Under review or whether it. Pre-existing the project. I couldn't tell that from the affidavit. Thank you. So, so there were a number of questions. And I think there was some focus on. Miss Kara's on really two categories of issues. One was. Evidence of abuse when it comes to affiliate agreements. And the second one was, I think, whether or not the commission actually relied solely on. The affiliate agreement here. And I think there was some focus on paragraph 24. Maybe I'll start there. And I think here it's worth clarifying. There's a difference between the evidence that is offered or the evidence that the commission relies upon for a showing of need for a project. As well as versus the agency's independent obligation. To address opposing views. And so with respect to this issue, I don't think you can separate those two. I think that's a good point.   I think that's a good point. So what the pipeline offered was it offered the affiliate agreement, but then. As you all recognize it offered a number of other rationales as well. And so what the commission said in paragraph 24. Are you talking about the re-hearing? Yes. Yes. My apologies. Before you get to 24. Yeah. You agree with, at least in the original order. Yeah. Those factors did not factor into. Yeah. There's no discussion of them in the original. They mentioned them at the beginning, but they never analyzed. They never. Say that. Those factors are critical are significant. Factor in. Right. It isn't until the re-hearing order. In paragraph 24. Actually engaged. I think. I think I agree with that somewhat. I think that. Commission certainly looked more closely at these issues. What does somewhat. So what the commission said in the certificate, or it did recite those rationales offered by the, the pipeline applicants. I went on and said, look, that's up to them. Those are business judges. And I think that what the commission said was that based on the record before it. That's not what it said. Well, okay. I think it said that in the re-hearing order. Right. So we agree at all. It rises or falls in the re-hearing order, right? On those issues. Yes. I think I agree with that. Okay. So, so what the commission said was that. In the re-hearing order. The, the spiral pipeline offered a number of rationales in support of the project. And the opposing views were that the pipeline was not needed. And as a result. There would be an overbuilding of. Or access pipeline infrastructure. If the project were to be approved. And so what the commission said in that paragraph 24 of the re-hearing order.  The commission said that in the re-hearing order. JA 1155. It said that it found the, the rationales offered by spire sufficient to overcome concerns of overbuilding. And based on that record. It found no reason to second guess. The business judgments of the pipeline. And so I think based on that. Based on that record. I don't think it's fair to say that the commission relied exclusively on the affiliate agreements here. Well, if they're, if they're saying nothing more than, there's no reason to second guess. What has been offered. That's really not an agency doing its own. Independent. Analysis of the factors that would justify this proposal. If they have to go further than the precedent agreement. And it's looks like a case where there's, you know, there's no demand. And all you have is a precedent agreement with one. Affiliate related affiliate. And the suggestion has been, and the possibility of self-dealing. And the suggestion is being made in that circumstance first got to do more. So it's not enough in the re-hearing to just say in pet, at least I'm questioning. You want it to just say in passing. Well, they propounded these and we have no reason to second guess. That's not agency analysis. I'm not sure. I'm not sure what the agency can rely on. I'm not sure what the agency can rely on. I think number one, what the agency can rely on them. Number two, I think you also referenced the issue. Self-healing with respect to what the agency can rely on. I mean, the certificate policy statement makes clear that. Number one. Servicing existing demand. Is just as out of reason to approve a project as servicing new demand. And that policy statement also makes clear that the commission will always treat precedent agreement. Substantial evidence of demand. Sorry to interrupt. But what about a case like this where you have, where you have a pipeline? That's not a, not serving. New demand and B providing no better price for the gas. And it's those two factors together. The petitioners say. Raises suspicions of self-dealing and that's what the defense. I'm not sure that. Let me just ask you this. You want to talk about. We're just looking at the decision. And all we have is a precedent agreement with an affiliate. And FERC agrees. Because FERC agrees. That the pipeline doesn't serve me. Doesn't serve me to me. And there are no materially significant costs. FERC agrees with both of us. So if that's the only record before us, What more evidence do you need? To put an obligation on FERC to look carefully at whether there's self-dealing. Well, I think that the way that the commission has treated. Contracts with affiliates consistently is that it treats them the same as contracts with non-affiliates. You're missing my question. It does treat them the same. I agree with that. A precedent agreement with an affiliate is fine. But in a circumstance like this one, where there's, where it's not serving new need and there's no price benefit for customers. I think this is consistent with city. Is it that puts a burden on FERC to look, to see whether. There's a self-deal. And FERC didn't do that in the original order. Right. I mean, am I misstating what the law is? I don't know that the, the, the commission has said the burden is on FERC to look for self-dealing. I think the question is whether anyone has offered any evidence of self-dealing at all. What more do you need? Then a pipeline. Constructing a pipeline for an affiliate where it is. It's not serving new market and providing no price benefit to the customer. I mean, That that just leaves the obvious red flag that this is for the benefit of the shareholders. Not the customers. So that is. The commission has treated the issue of really contracts. I mean, even with respect to city of Oberlin, over when we have the same record in the sense that they're the, the court help upheld the commission's reliance on the affiliate group, because there was no, there's no evidence of discrimination. And number two, the pipeline bore the risk of unsubscribed. Wait, wait, wait, that's not. I'm sorry, just title. I'm sorry.  I'm sorry. There was no argument of affiliate abuse in Oberlin and our opinion said, so. Agreements were only half. Of the agreements you had. Non-affiliate agreements as well. And you had evidence. Of need. So it seems to me that what we said there and what happened there. There's no resemblance to what's happening here for exactly the reasons. Judge Tatel said. So, so let's just be careful about what we're saying. About what we said was permissible with respect to affiliate agreements and city of Oberlin. So taking that understanding, the city of Oberlin. I'm interested in your answer to judge title questions. So, and I think the question was what more would need to be shown with respect to abuse or self-feeling. I have a threat. Of abuse or self-feeling. To say something. That's what. That's what. What do you want? If it isn't these two factors. What, what, what else could there be? Would be more dramatic than this. Your answer. I don't understand. I don't understand your brief or. Argument that this somehow does not. I don't get that. Yeah, because remember you started out by saying, when you look at that response in the rehearing. For it was fine because there was no reason for them to go behind anything. And we're like, really? And judge title is asking you very pointedly in this situation where they're no, no needs and then no cost savings. Is it enough for us to accept your argument that in this situation? They offered what they claim to a business reasons and we had no reason to go behind it. That's strange argument. Sorry, before you answer. Title on I've lost this picture. On the. Okay. I just want to make sure you're on for the answer. Okay. Okay. Well, so I think there is, again, a difference between what the commission relied upon here. Versus the issue of self-feeling. I think what I'm self-feeling, the commission pointed out that no evidence at all. Had been offered. To question the affiliate contracts and the commission's approach. I hate to keep interrupting you, but that's not, that's not the petitioners.  That's not the commission's argument. The argument is that FERC ignored. Their evidence of potential self-deal. That's. Can't respond to that. You can't respond to that by saying. Well, you know, FERC said they didn't offer any evidence of self-dealing. They did. Their evidence is no market need and flat pricing. And that's what the commission is trying to get at here. And what all three of us are trying to get at here is why isn't that sufficient? To at least raise a red flag. Not the possibility. That's the question we need an answer to. Because one reason. Because if you don't have an answer to that question. And then the case rises and falls on. On what the commission said. I don't know. I don't know the answer to that question. Well, at least with respect to the issue of abuse. I mean, one issue here is that what the petitioner has cited. Are cases involving a different set of issues. So. There has not been any cases that they have cited involving. Approval of certificates. So that's one issue. And then the other issue is that. All those other cases they've cited have involved. The commission's review of rates, for example. So if a party is seeking. Approval of whether a rate is just unreasonable and the commission might. Look more closely at whether there's an affiliate relationship there. But I guess our point is that. They're not. That's not a comparison of like things. Why, why. Why is that? Why is that not. As to the risk. Of affiliate. Manipulation. Why is it different? Whether they're doing it for rates. Or doing it for. To come up with some evidence of need. Well, because here's the commission's not reviewing a rate directly to review. A rate case. I understand this isn't a rate case directly. I'm asking you why, when it comes to raising eyebrows. We're setting off the radar. At least the obligation to inquire further. Why is it different? Whether it's a rate case. They're using the affiliate to justify. It's part of charging a rate or you're talking about using them to establish. Why is that different? Why is it different? Because I guess for one. The what the commission is doing here is it's not, it's not. Being asked to review an agreement, being asked to approve a application for a certificate. So that is different than. Procedurally what they're doing here is different. I'm asking you. Not for differences to what FERC is doing. How is it different? I'm asking you. As to the concerns about the relationship. Between the, between spire and it's affiliate fire, Missouri. And part of this gets to. It's slightly different issue, but I think it's worth going there now, which is. The commission pointed out that it's not the commission's role. And actually the state regulator also asked the Christian to clarify that it is not the commission's role. That's changing. Okay. So the commission is the role is okay. So your, your point is that. This could be just as bad, but at this. At this. It's this procedural stage. It's not FERC's job to look. At this stage, the commission's role is to rely on if an agreement is offered in the state regulatory. To show that it's, it's in support of a certificate to show a need. The commission is looking at the distance of the agreement. It's not reviewing the terms. That's in this case. You just said. Isn't there a different is because this is the Missouri commission. Public service commissions, we'll have not. FERC to look into a B. Is that right? No. I'm misunderstood. I'm trying to figure that out. Well, I think what I'm trying to say is that it's it's up to the state regulator to decide whether the terms between the local distribution company. And the pipeline are. They're within their authority. I mean, of course. It's the commission's role to assess whether there's a need for the pipeline. When it's reviewing need, it considers agreements, but it's been. The commission is consistent policy that it's not going to. It's not going to. Treat affiliates differently. Unless there's evidence offered of abuse and that is different than how the commission approaches these sorts of agreements when it comes. Can you define or tell me what would be evidence of affiliate abuse in this. Contact. Okay. Well, It's a little hard to be abstracted. The commission said there was no evidence offered here, but I guess one way to look at it. Is maybe with the open season process. If you had an open season process. And you had a company that wanted to bid for service, transportation service and somehow was denied the ability to do so. And that party pressed forward with rehearing at the commission. I suppose that could be a potential issue where that party would say there was an open season, but it actually wasn't. I don't know how the open season doesn't hurt you rather than help you because. Fire Missouri didn't participate in the open season. If it really had a need, it would have shown up in the open season. It didn't. If it really had a need, it would have shown up in the open season. And if it really wasn't, if it wasn't after the open season was an additional failure, because nobody wanted this gas at all. Then. To them. The appeal, the agreement between the affiliate and the parents materializes. I don't think that helps you. But again, I'm asking you. Burke says. It looks for affiliate abuse at this stage or even just concerns about. I'm not saying what it has happened or not. It looks for concerns about it. I don't know how it can look for concerns. If no one can tell me what. What they mean by affiliate. Does it mean that. We're using the affiliate to create needs that wouldn't otherwise exist. Is that in the form of a, is that a form of affiliate abuse? I suppose it could, but I think just to be clear, just. The commission's not. The commission is not going to dig into affiliate abuse whenever there's a potential for affiliate abuse. I think the concern that was raised by the environmental defense fund is that these kinds of transactions are inherently. What more evidence would you need here? When you have. You have the affiliate. Your relationship. It's the only. Agreement. The affiliate didn't participate in the open season of its own volition. The affiliate didn't participate in the open season of its own volition. This agreement appeared only after. The open season. Failed completely. There's no cost saving. There are other pipelines that they want already in existence as they wish to diversify their sources. I don't agree with the number. Okay. All right. Which kind of sent you a great list. Okay. So first off, I'm not sure I agree with the point that the open season was a failure. I think what the commission said was that it's concerned with open season is that there's an opportunity to subscribe for service. Did anybody say they wanted to, wanted to subscribe to. I guess on this pipeline. No, but that doesn't make it. Looking for an authorization with nobody subscribed. Okay.  I guess that would have gone very well with it. That wouldn't have gone very well with it. I think that the commission's point is that there needs to be. Somebody wanting some of this gas, isn't it? Okay. Well, I mean, I guess. Maybe I'm wrong. Just Kirk approved pipelines where nobody there's no contract for it. Nobody's nobody wants it. I mean, I assumed that would not happen, but. They had to come up with something. Okay. Well, I guess my point is that the commission's not focused on when the agreement. What, when, when a party decided to enter into an agreement, it's whether there's an opportunity for others to participate. I understand. That's what we're asking is whether when you have timing like this, does that make it. I understand the commission didn't. I think we all understand the commission didn't work. The question is. If the factors at least that have been recited to you. Aren't enough. I have for at least express further inquiry. Would you have to have, do they have? What more do I have to have? Whatever. Okay. So, so I guess let me put it this way. To contrast this with the record we have here. So if the pipeline offers a number of rationales for our project and opposing parties come forward and respond. And, and those responses. Don't and the commission and those responses. Fully address and rebut the pipelines. Stated rationale. I think that could be something that's not what happened here. And I think that one of the issues you pointed out was availability on existing pipelines. Well, the commission made a finding that there was not sufficient available. Gas on existing pipelines. You can look at. Okay. Yeah. Do tell me that one. Cause I thought there are plenty of other pipelines. There are other. They didn't have sufficient. They weren't getting sufficient supply from enable and these other pipelines, but you don't do tell me where they found. The only way to get sufficient gas in. So, so there are, so good to you. Okay. The commission finding is that J a 10, 19 paragraph two 13. And the commission points out a claim by the enable pipeline. It had existing capacity and it says. Christian found. One second. Hang on. I'm trying to get to the same page. You're on. Sorry. 10, 19. Okay. Paragraph two 13. It's the second. Okay. The commission says as MRT that's enable. As their own comment notes, the East line and the Illinois. Interstate pipeline do not have adequate available capacity to meet the needs of this virus. Pipeline project. And the specific data that it's referring to. No, no, but there are other pipelines besides enable. That's correct, but they're not all serving the same side of this service territory. Where's it say that. So where did they analyze all these other pipelines as well? Well, so, so the data about. Not enough existing capacity on the other pipelines. You can find that. A few different places. There's a J. I'm talking about the combined capacity here. I mean, they either want to diversify or they don't, but. I don't know. They were, they, they were they not getting enough from enable was there insufficient supply from enable? That's one of the rationales that was offered by fire that. By the commission that they were. I don't care what. Fire saying for this purpose. I want to know is, is the commission to find. That they got to have this new pipeline because they are getting enough. I didn't see that anywhere. I just saw enhanced. Reliability and flexibility. And I don't know if that's what they're looking for.  I don't know what they're looking for. They don't have enough capacity. Where's there. They don't even have enough gas coming through. Where's that. I think what I just pointed you to judge. The commission found that. The existing. Options did not have adequate available capacity and. The needs of the spire STL pipeline project.  Fire Missouri. Well, I don't think it says that that's specifically, but. I don't think it says that.  I don't think it says that the spire of Missouri signed up for. 87.5% of the capacity here. And if you look at the numbers. What's fire Missouri and neat. Were they not getting enough gas? They're the source of need. We don't, we don't ask whether the other pipeline. Has need. We're asking whether there's a need. Person one. I have this capacity that this new pipeline is providing. So I don't understand what it. I don't know. I don't know. They don't meet the needs of the supply. Fire pipeline project. Where's where's the same. Fire Missouri. I mean, I'm not sure. First thing. That would have been the first thing first. What is that? Right. I didn't. Even in your paragraph 24. It doesn't say that. Well, Paragraph 24 does actually. That's one of the issues that issues. I don't know.  I don't know. It says the inability of current pipelines to provide an additional. 350,000. And that's what. Signed up for. And so if you look at. Okay. Right. And additional, but they don't have increased needs. There's no need to support it. There's no question that they'll. They'll produce more, but what we're seeing is they're producing more than is needed. I don't know that it's more than it's needed. It's, it's what the customer is asking for. And part of what they, the reason they're asking for it is to provide a, as we've talked about the more diverse supply options to the region. To replace expiring contracts. And to replace a, an aging. Propane facility. That's it more diverse. This is their only source of gas. I'm sorry. It's not their only source of gas. It is. I mean, to be clear that fire Missouri has gas coming in from, I think the east side of its territory from the west side. And so, for example, there are pipelines like. I believe the Missouri gas company provides. Yeah. Let me just ask you an unrelated question. I know you don't talk about this. Some of the other parties do. Yeah. If we were to agree with. The petitioner here. And. Believe that the commission. Decision was arbitrary. Do you have any view about whether we should. Why we shouldn't also vacate the commission's decision. I would say under this court's precedent, you should not vacate. The commission's decision. I don't know if that's the case. I hope it won't come to that, but. This is a scenario where, to the extent there's a concern about whether the commission can provide more explanation on remand. I think it could. And I think. What would give us confidence? Well, I mean, part of the. At least a big part of the argument that's been raised that the commission only relied. On. On the, the precedent agreement. And we pointed out, we disagree with that based on what the commission has said in the record, but if the court thinks the commission. Can provide more explanation on that. It can remand for further explanation. Also point out that this is an operational pipeline. It's been operational for. Almost two years. And so similar to city of Oberlin. It's been operational for almost two years. And so similar to city of Oberlin. For the reasons that that court. It would be disruptive to vacate. At this point. Yeah, I agree. We didn't do that. Well, let me ask you about the question of disruption. Couldn't. Couldn't the pipeline here simply. Go back to getting natural gas from its previous sources. I'm not sure we have a record to show how easy that would be judged fatal. I know that. As I mentioned, but when it's been operational for some time. And it's been receiving gas. On spire for. You know, roughly two years. So. I think that could be a question that Mr. Franklin might be. We don't have a record. The reason I'm asking is that. I mean, look, if we think. That this record supports. I don't know. If we don't have a record. Why would we allow the pipeline to continue? Why wouldn't we. Vacate the decision while commission figures out whether there is. No, because I think that you can, you can. You can remand to the commission. The commission can investigate the issue without having to go to the extraordinary remedy of vacature. I guess.  I think that's a good point. Yeah. Do you have any more questions? I have one. Go ahead. No. No. On your paragraph 24 and rehearing one of the things that was credited. When you just went through the list of fire, Missouri said, and I'm trying to make sure. Sounds like the commission credit all of them. And that was that it would move. The pipeline. Capacity or supply away from a seismic zone. Is that right? Yes. That's one of the rationales offered by that's something of concern to the commission. The pipelines not be. Not traverse seismic zone. I think that's, I mean, that's certainly a. I think the commission's point here is that's a valid reason for a pipeline.  I think that's a valid reason for a pipeline supplier to want to diversify. It's source of. Not just the source of gas, but the path. By which it receives gas. Sorry. Commission considers that a relevant concern. I think that's among guests. I mean, that's. That's a really lifted it. And I said. Okay. I'm not sure why you're arguing with me over this. No, no, I'm not. I'm not. I'm not. I'm not arguing with you. I think my point is that this is among the rationales. The commission. So it's a relevant concern. Who authorized, who authorized all these pipelines that are going over seismic zone. Well, I assume the commission would have, but obviously that's. Before. The times of this record. I can't. I can't sit here and explain. Authorized all these pipelines. That are going over seismic zones. If you look at a map of pipelines across the United States. And seismic zones. Countless pipelines. What in crediting this finding. No longer safe to have a pipeline. This is a real reliability concern. But it's a real reliability concern. If your pipeline crosses a seismic zone. I don't know. I don't think the commission was making that finding at all. Making a finding that that was a real reliability concern. I think the point here is that the commission is finding that these are the sorts of issues that. Based on the record before it. It's not going to try to second guess. The judgment. When it said here, These findings are sufficient to overcome concerns where we're building. They actually meant what they said in the next sentence. They've said this list of things. And we're not going to second guess. Right. Yes, that's exactly right. Look, I'm asking you either. You meant. It's a real reliability concern. To have a pipeline that goes over a seismic zone. And you just said. I don't know. Your answer is I understood it. Missouri said it was a concern. And as the second second says, we're not going to second guess that. That's what I've understood you to be arguing all along and that rehearing, they weren't really making findings. I was saying these have been asserted. We're not going to second guess them. I mean, certainly there's no, there's no attempt in the orders to assess by the commission to assess the risk of earthquakes. Or any of these things on the list. Any of this. I mean, I pointed you to that. Capacity point. Well, they listed seismic zone. Did they mean it or not? I mean, they, they, that's, that's one of the issues. Up to the judgment of the shippers. To the judgment of the shippers. Got it. Okay. Okay. Thank you. We will hear from Mr. Franklin. Is that right? Yep. Can you hear me now? Yep. Yep. Thank you, Jonathan Franklin. Representing Spire. STL pipeline. The intervener with me here at a safe distance is Chris bar who represents intervener Spire, Missouri. I'd like to start with what I think is a misconception about what FERC found in its original order. It did consider the allegations of anti-competitive conduct. What it said was we have a precedent agreement that would normally be sufficient in itself to show need, but it's between affiliates. So we're going to look and see if there is evidence having been presented by the petitioners below of anti-competitive conduct. And it specifically considered and rejected the argument that there would be unnecessary overbuilding. And it did so by relying on legitimate non pretextual statements of need that are undisputed in the record. And to your question, judge Edwards, there's nothing in the opening brief of EDF challenging any of these needs except for footnote two where they say the propane peaking facilities was not a real issue because they were rarely used. And that's obviously incorrect. And it shows to me the precise reason why this was needed. The propane peaking facilities is one of the reasons that Spire, Missouri gave for needing an additional supply. It is undisputed, and the counsel for FERC is correct, that the needs for that capacity, in other words, to be able to retire the propane peaking facilities, no existing pipeline could meet those needs. And you can find that, your honors, at page 1018 and 1019 of the rehearing order, which cites the environmental assessment at pages 769 to 772. You can also find it. Sorry, I'm sorry. I'm just going to slow down a little bit, because I don't know my numbering is the same as yours. You said the reason. I'm looking at the rehearing order at 108, 101. Can you tell me what the J is? Sorry, JA1018 to 1019. 1018, okay, okay. I'm sorry. Wait, no, hang on. Wait, so you must mean the original. Do I have the wrong JA? My JA has the rehearing started on 1144. I'm sorry. That's the original order. Okay, so that's what I'm confused. It's the original order. Sorry. Sorry. 1018 to 1019. Hang on. 1018, right? 1018 to 1019. 1018, sorry. I'm not fast enough. That's okay. Okay. And that is citing the environmental assessment, which you can find at pages 769 to 772. And then you can also look at pages 953 to 954 of the record. And this is the cost estimates that the FERC was looking at. And my only point here, by the way, Your Honors, is to show that all of these cost estimates and all of the environmental assessments were based on the predicate that all parties agreed to, that in order to retire these propane peaking facilities, something new would have to be built. Existing pipelines simply could not provide that capacity. And this is important, Your Honor, because this is where it gets into the question of anti-competitive activity. What FERC said is, we are not going to second yes Spire, Missouri's decision, to retire its propane peaking facilities. That's within the business judgment of the company. And what we're going to show is that what we're going to look at is, are there existing, does the existing pipeline serve those needs? And the answer is unequivocally no. Existing pipelines could not. Can I back up? Sorry, I'm just missing something here. Where do I, where do I, I'm just not seeing it. I looked at it and I guess I didn't see it. Where does it say this is talking about replacing the propane? It's talking about all of the benefits that the project would provide. All of the benefits. All of the benefits. And it's saying those could not be provided without additional facilities. So what MRT, who's no longer in this case, was saying was, you can do something else. You don't have to use Spire STL. You can build an additional loop onto the MOGAS pipeline. You can use some of our facility. And what FERC found, as a matter of fact, in the environmental assessment and at the pages that I mentioned, is no, you can't. You cannot do it without building additional facilities. And by the way, each of those additional facilities would have at least the same, if not more environmental impact. What FERC did not do. So I'm on paragraph 212. And what it says is staff found that use of these facility systems as an alternative would not provide a significant environmental advantage. That's correct. But my point is even going before that is to say that you couldn't. No, no, I'm sorry. In the logical analysis that you could not meet the needs that's fire Missouri identified legitimate non-protectional needs could not be met by existing facilities. And so first entire analysis on the environmental end of things was let's look at the alternatives and the alternatives all required building new facilities. But again, are you saying then that even if there was no demand and you didn't even have a precedent, you had no agreement, no precedent agreement, the commission found that it would still be a legitimate because of these other problems. They found it best based on the precedent agreement, but what they found is there was no anti-competitive conduct because there were legitimate non-protectional needs that could not be met by the existing system. And I'm going to focus really right now on one of the key ones, and that is the retirement of the propane. We don't know that we don't know. I just don't see anything here that lets me know what all we have is the commission says we accept the staff environmental assessment, evaluation and elimination of alternatives. We don't know what then does that mean they were finding everything was a problem. What they were finding your honor was that the needs of Spire, Missouri that were identified that were legitimate, non-protectional, by the way, all of these needs were identified in first certificate policy. So I'm looking at, they were listed, right? That's right. Go ahead. Tell me where you are. I'm at six, one, seven, four, eight of the certificate policy. And what they said in certificate policy, I'm sorry. Okay. Sorry. Yeah. And it's, and it's quoted in almost every brief. And what they're saying is that just new demand, isn't the only thing that justifies a pipeline, right? Includes access to new supplies, providing new interconnections, improving the interstate grid, providing competitive alternatives, increasing reliability, propane peaking facility. And this is in the record. Your honor is that that page is, and again, I hate to keep doing J a sites, but a page is eight 31 to 32. What the reason for retiring the propane peaking facility is that. Hang on one second. What is it? What document is that? Eight 31, eight 31, eight 32. This is a response that Spire STL, my client gave to FERC. Oh, okay. And so what it shows is the reason they were retiring the propane peaking facilities is that they were the only LDC in the company country that was injecting propane at times into the gas supply, but newer things like electric, excuse me, natural gas vehicles and high efficiency boilers can't use that propane mixture. It's too high. So they needed to retire that and no existing pipeline could meet the demand. And the only thing that, and judge Edward, this gets to your question. The only evidence of need that was a challenge in the opening brief was at footnote two of EDS brief. And they said, Oh, the propane peaking facility, that's nonsense because you only use it on a occasionally. Well, that's clearly wrong. Propane peaking facility is necessary. It was required by the Missouri PUC. It is needed to supply gas on peak days. And here I'd like to give you a follow up there. Am I right? It was used three days and five years, something like that. Your honor. And I apologize. Yeah, but that's the point of the fact is, does it work those three days? But they, they have to do it works, but what they have to do, they would have to give notice and then the market is changing. And that's what the, what I said in the pages I noted is that more people have electric, excuse me, natural gas fired vehicles. And then there are these new high efficiency boilers. This is an aging system. And so what Burke said is we are not in the business of questioning whether or not an LDC, which we don't even regulate, has a need to retire its propane peaking facilities. We are going to look, we're not going to go behind that. And that was proper. That was proper, but we're going to say that that shows that they have a legitimate non pretextual reason for wanting to sign up to this pipeline that goes beyond demand. And if I could give you a real world example, let me, let me, can I frame it up just a little bit before you continue? Sure. The policy statement to me is strange in the sense that it's kind of all over the place. But one of the things that I focused on at one point it's at a 61, seven 47 rather than relying on only one test for me, the commission will consider all relevant factors reflecting on the need for the project. The commission will do this. These might include, but would not be limited to precedent agreements, demand projections, potential cost savings to consumers or a comparison of projected demand with the amount of capacity currently serving the market. That's the commission's view. All right. So now what I'm trying to figure out is apart from pointing to the precedent agreement, which is only one of the things listed in that sentence, where did the commission in its opening disposition with respect to the certificate, analyze these factors and conclude that they all justify giving him a certificate? Where is that in the original, in the original statement by first, I don't answer that. You're not, you are not, you are you kept referring to a lot of different documents, including submissions that you made. I don't want to, I don't care about what you submitted. I want to know where in the analysis did FERC go through those five or six factors and say, we've considered them all in this project should get a hold. Where is that? Can I ask that in two different ways you're on? And I will get to the answer to your question. The answer is they didn't, they didn't need to. And this court has recognized they didn't need to. I'm reading now from the menacing case at footnote 10. This court said that while the policy allows FERC to consider all of those things, right. A precedent agreement is by itself sufficient evidence of need. And that's the same way I press counsel on the other side. So you're suggesting that the precedent agreement, Which is what we've been worrying about. Is it, that's all that was required in this case. And they had a precedent. Then where, where is there? The problem is we're all saying to you, whether you like it or not facially, it looks like this is a case where some kind of balancing might be required. Just common sense. Intelligent people looking at this would say some kind of balancing is required. I don't know whether there's a precedent agreement in this situation where there's no demand and an affiliate. I don't know whether there's a self-dealing concern in any event. It reeks of, is there anything else? So that precedent that you cited doesn't answer my concern. Cause I don't, the precedent, I don't read the precedent to say we're a case reeks of a need for more FERC doesn't have to give it. I don't buy that. I don't, I'm not selling it. Here's what I think judge Tatum might have mentioned this before, where there is a precedent agreement between affiliates. FERC does require more and did require more in this case. It requires a, it, excuse me, it requires FERC to find that there's no evidence of affiliate abuse or anti-competitive activity. Mr. Franklin, I want to interrupt you. You're making the same argument that FERC counsel, the petitioner's argument is that the is the first conceded first acknowledgement of a no market need and B no price benefit was by itself sufficient to impose on the commission and obligation to look deeply into this, to see if there was self-deal. That's their argument. And based on our caseload, that seems to make sense to me. And what we're all asking you, what we're all asking you is we can't find in the commission's original order where it did that. Do you agree with, do you agree with judge Tatum's premise that in that situation, FERC is required to do more? I agree that fire this FERC was required to look for whether there was evidence of anti-competitive conduct. And it did that. It did that. It did something extraordinary in this case. It found that the pricing, it actually asked for one thing. You said anti-competitive conduct. That's not necessarily the same thing as affiliate manipulation. So can you rephrase your sentence in responding to what we've learned about? So they had to look for both anti-competitive activity and affiliate abuse. And they did look for both of those. They didn't say, where do we find in here? What the evidence looks like is that basically, you know, since there is no price benefit, that the benefits of this things go to the shareholders, not the customers. And you don't have to look for any other evidence in that. So why isn't that by itself enough to impose on FERC a burden to explain why they're doing this? And they did. And I think they did it at pages 968. Say that again. 968. 968 to 969 of the record. So that would be paragraphs 83 to 85. And this is the original order, not the rehearing order. And this is where they said the other side, and this is still EDS argument. At page 22 of their brief, they say, there is no rational explanation for this decision to sign on to the project except for advancing the corporate enterprise's interests. And FERC looked at that argument and said, no. There is a rational explanation. And the rational explanations are several fold. This is enhancing reliability, enhancing getting new gas from the Eastern part of the country that it could not get before. If it doesn't go through an earthquake zone that doesn't travel hundreds of miles from the South. And if I might, your honors, I'd like to read to you. You're talking about 968. That's where they recite higher Missouri's reasons. And they say all of those issues fall within the scope of a business decision of a shipper. The commission's policy is not to second guess the business pipeline shippers. Unless there's evidence, unless there's evidence of affiliate abuse and they don't do anything more. So how is that showing that they thought there was affiliate abuse and look for more? They didn't think there was affiliate abuse and it wasn't what evidence of it. It does show if I might continue, I'm sorry, your honor. I don't want to talk over you. If it, the reason FERC was correct not to go behind and to, to second guess the business judge, I'll use the propane as a good example. FERC is not in a position to tell a gas company, it cannot retire its propane peaking facilities. That is within the business judgment of the gas company. That is something that FERC is not going to second guess. What FERC is going to do is saying, you have said, you want to retire your propane peaking facilities. We have found that I cited you the pages and there are other ones as well. We have found that that cannot be accomplished. It cannot be accomplished without some new facility. So the pipeline serves that need. And it shows that the precedent agreement is not merely an agreement with FERC. It is an agreement with FERC to enrich the company at the expense of the rate payers. And if I might, I just want to. Wait, wait, Sorry. We're going in circles. We're going, we're going in circles. We're trying to figure out this. Judge Tate a long time ago said, look, you have a situation where it's conceded there's no new demand and it's conceded there will be no cost savings. From this project. And that raises our eyebrows. Now, I don't know whether it raises an eyebrows about self-dealing, but it raises an eyebrow for me about needs. And, and, and it certainly picks up on some of the points that are in the policy statement. And you seem to be agreeing that yes, FERC has to respond to that. And then you say their response is we're not going to look at what's been asserted to answer that question. That's not an answer. It is an answer to the question because the argument below your honor, the argument below was that, and it is still the argument on the field. There is no other rational explanation for this pipeline, except anti-competitive activity. And FERC looked at that argument. The argument is there is no other rational explanation. And FERC said, no, there is. And if I might, I just like to read to you. Is that what you're going to read to me? Well, no, FERC said that at the pages I just gave 967, 968. Okay. I know you want to read your other thing. I do want to let you do that. Can you tell me where they say there's no other rational explanation for this? They said that there is a rational explanation. Where'd they say there is a rational explanation? Yes. Let me, let me, let me tell you what's going through my mind. You say there is a rational, and then you're going to say they recited the evidence offered by the proponents of the project. And then they follow that by saying, and we're not going to look to see whether that's right or wrong. Cause that's their call. That is an argument. I don't know how you characterize that, but that's not a winning argument. There is a rational explanation, but we're not going to check it. That doesn't make sense to me. No, no, no, no. The other side is obviously going to say, yeah, we think we're right and folks not going to look to see whether it is in fact right. They weren't none of these things were disputed. You're on none of these benefits were disputed below. The only argument was you could achieve them through a different series of other pipelines that could have been built. Okay. So let me, let me hold, let me hold this down in my mind cause this is what I was raising with the other side as well. Is your argument that the justifications that you offered from the get go to support the project have never been contested by the petitioners below or now that they really have not made a claim that there's no evidence to support those justifications and the justifications were there uncontested for it has to do nothing, nothing more. Is that right? Your honor that they, that these needs could not be met by existing services. Yes. And the only argument that's made in the opening brief is that footnote too. And that relates to the propane peaking facilities. And that argument is clearly wrong because the fact that they didn't use them very often doesn't mean they didn't need them. And if I could just, this is what I want to read your honor page, page eight 33 of the record. And this is when same part of the record I just identified before. This is fires giving to the commission, it's explanation for why it needs the project. And one of the key things it said is it's a reliability concern. And it said we need it because quote regional events such as supply freeze off, major storms or extreme cold can create significant regional price spikes in the cost of gas that can be mitigated or avoided completely by having access to multiple differing supply basins in differing geographical regions. That is undisputed. Your honor. There's no, but what's the commission, Mr. Franklin, what the commission said in response to that was that's the company's business decision. We're not going to look behind. Right. But there was no dispute your honor. Your claim is that that justification, those justifications were never challenged. That's the heart of your argument. It is part is a very important part of our argument. I understand your, I want to make sure that I'm hearing you now. That's the crucial part of your argument. If there is some claim here, they never contested what we offered and we clearly offered something. And I'll say, I'll go even further, your honor and say, they didn't contest it on appeal in their opening brief for sure. Well, I raised it and I will tell you that it is public. When I spread public knowledge that exactly what I just read to you happened last month. There was a freeze up in Texas, where gas supplies literally froze up at a time of peak demand. So that the Texas governor issued an order saying gas cannot leave the state of Texas unless it is not being used to supply electricity. I thought the Texas governor said the whole thing was because of the wind turbines. No, it's actually the gas was incredibly important. He didn't say that. I thought he said that his whole problem was because of the windmills. Well, the order, the order that he gave was about gas, your honor. The order he gave was saying no gas can leave Texas unless it can't be used for electronic electricity. Now, if the petitioners had had their way, this fire STL pipeline would never have been built and said city of St. Louis, the entire metropolitan area would have remained captive to the MRT system that drove the true gas from those same areas, which meant that exactly what was predicted at page eight 33 of the record would have occurred. Not if it's in the record. I mean, we can look at the record and make our own judgment about whether, as you say, the petitioners never challenged. Exactly. But my point is there's no market study that, so they're saying you have to do a market study. No market study for could have done, would have predicted that there would have been record cold and a gas crisis in Texas in the year 2021 for three or four years later. That's the business judgment of the company. But what FERC did say is we're going to look to see, are there legitimate? It's a pipeline. Did your clients say, well, we need this new capacity because the system might freeze up in the future. Yes, that's exactly what I read to you at page eight 33 of the record. Exactly. In exact, those exact words, your honor in those exact words. And the reason was eight 34 of the record. It had happened before in 2011. And the point I'm making is that FERC said, I'm not, we're not going to, we're not going to second guess the company's business judgment on these things. Now, if the other side has said, this is, this is a bunch of, it's a load of Huey. It's never going to happen. It couldn't happen. There's no reliability issues. Then they might've looked at it, but they never did that. And they certainly, your honor, judge Edwards in particular, they certainly haven't done it on appeal. Can I back you up to? Yeah. Okay. Day 32. Yes. Paragraph C. Uh, to find that your honor. Okay. 26 makes you feel better, but it's day before the one you've been talking to us about. Okay. I'm getting there. Yes. Yes. I'm there in paragraph C. Second line. The decision has already been made to retire the propane system. So that was made before. Oh, there was, it sounds to me. Yes. Okay. Let me just finish my question. The decision had already been made to retire the propane system before. This fire pipeline came along. And the reason they want, Oh, no, that's not what I mean. It hadn't already been made to retire. That's what they, that's what they wanted to do your honor, but they couldn't do it without. Why didn't they show up in the open season and saying, we need this. Burke, you're all wrong. This isn't, I know needs flat. The only, we need this. To replace our propane system. Why didn't they show up in the open season saying that. They said it in their application to FERC. It's one of the key things they said, your honor, and they weren't the open season. They already had a precedent agreement before the open season. No, that's not what the record said. The record says that the agreement came out after the open season. They started, may have started talking before the open season, but the record says the agreement with fire Missouri came after. All right. So the evidence says, because all we say is they had already planned to retire this propane system. They have any other, so you're saying they didn't have any. I just don't know. What I'm saying, your honor is they could not do it. They only recently it's about 90% retired. Now they could not do it. Absolutely. They could not do it without this pipeline. So if Burke had denied them the approval they were seeking, they would not have been able to retire the propane peaking facility.  So the record says that they could not, this was the only way it said where. It's not the only way they were. So MRT, and this gets back to those pages that we were having trouble with finding earlier on. There were other alternatives offered by MRT, but all of them. There's other pipelines too, including some that connect to re X. That's why I'm rather confused. Right. But for rejected all of those alternatives and it's environmental. They didn't provide significant environmental advantage. Or even more cost efficient. The point I'm making now, your honor is a, is a more fundamental one. And that is that the existing pipeline systems, the ones before Spire STL could not. Kerry could not give the demand that was needed to retire the propane peaking facilities. They could not all of those alternatives that we're talking about. The ones that were evaluated in the EAS, they all involved building new facilities, looping other pipelines, putting additional pipelines through the existing systems could not handle it. And that is undisputed. There is no dispute and nobody can give it to you because it's not there. The capacity that need was needed to retire the propane peaking facilities could not be provided without exist on the existing system. So there was a need for this pipeline. They had shown an assessment for this pipeline. Then they looked at the environmental impacts and said, we're evaluating the alternatives. What are the alternatives? All of them involved building something else. That's why the no action alternative was rejected. They all involved building something else. And we're going to say in our expert judgment, the Spire STL pipeline, which doesn't cost materially more is sufficient. So it is in fact exactly what you want FERC to be doing. You don't want FERC to be coming in. And frankly, I'm not hearing your honors saying that this is true. You don't want FERC to be coming in and saying to Spire Missouri, you've told us you want to retire your propane peaking facilities. And Judge Millett, as you said, they'd already made that decision that they wanted to do this. This court is not in a position, and FERC is not in a position to tell the company it can't do that. You have to keep this stuff in place when you're telling us that it has operational difficulties. We're also saying, you're telling us you need reliability because there might be a major freeze off or a storm or cold weather. Page 833 of the record. FERC is saying we're not second guessing that because nobody has told us, and there's no evidence that that's a pretext, that that's some sort of a made up thing. And what FERC is saying is, yes, when there's an affiliate agreement, we're going to look a little bit more. We're going to say, is there evidence of self-dealing or is there evidence of anti-competitive activity? Here there was not, and there was not because there were legitimate, unrebutted, non-pretextual reasons for doing this that could not be met, could not be met by existing systems. Mr. Franklin, I think, I mean, unless either of my colleagues has another question, I think we've got your partner. So, is that right? Judge Millett, Judge Edwards, are you okay? Yes. Okay. So, Ms. Carson, you can take two minutes. Thank you. And Mr. Robertson. Thank you. So, I just want to clarify one point. Our opening brief attacked what FERC said was its rationale regarding need. FERC said it relied on the contract. It had to do more because the contract is supported by captive customers. On FERC's brief, for the first time it said these factors were extra contractual evidence of need. And our reply brief rebutted all of those. The Supreme Court explained in the Atlantic refining case that because the commission's task under Section 7 of the Natural Gas Act is so crucial and has such far-sweeping consequences, if there is a situation where an application probably would not be in the public interest, a certificate should not be issued. Here, as Commissioner Glick explained, the record is patently insufficient as there is neither evidence that the SPIRE project is needed nor that its limited benefits outweigh its harms. FERC is supposed to act as the guardian of the public interest. Its blinkered reliance on precedent agreements to satisfy market need has gone too far in this case. The viability of existing pipelines is threatened, captive customers now pay higher rates, and EDF members' land has been taken and damaged while SPIRE continues to pay itself millions of dollars per year based on an unneeded and legally unjustified project. We respectfully ask the Court to vacate FERC's orders to ensure this damaging precedent does not stand. Thank you, Your Honors. Thank you. Mr. Robertson, do you need a minute or not? Yes, please. I disagree with Mr. Franklin regarding the no-action alternative. It was not denied by FERC because it didn't build anything, but because FERC defined the project in exactly SPIRE's terms, which they are not allowed to do. This is an example of the procedural injury that we suffered. The EA, the certificate order, the order under hearing are a medley of inconsistent and contradictory justifications for evading NEPA. And, for example, they simply refuse to consider the climate impacts that we are trying to challenge because they define cumulative impacts as necessarily local. But global warming is global in nature and must be considered in that context. And they... And I... I'll leave it at that. Thank you. All right. Well, thank you. So, the case is submitted. Thank you all.
judges: Tatel, Millett, Edwards